*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JESSICA AYERS, Personal Representative of the
ESTATE OF TERRY NOVAK,

      Plaintiff-Appellee,

v

NICHOLAS TOTH and FSS TECHNOLOGIES
LLC,

      Defendants-Appellants.

UNPUBLISHED
May 21, 2026
10:50 AM

No. 371716
Wayne Circuit Court
LC No. 22-001968-NI

Before: RIORDAN, P.J., and O'BRIEN and YOUNG, JJ.

PER CURIAM.

Terry Novak[1] suffered severe injuries as a result of being struck by a vehicle owned by defendant FSS Technologies, LLC and driven by defendant Nicholas R. Toth, while Novak was snow blowing his driveway. Following a jury trial Novak was awarded $20,595,570.66 in damages. Defendants appeal as of right and we affirm.

## I. FACTUAL BACKGROUND

At about 2:30 p.m. on February 3, 2022, Toth was driving a white van that had "FSS Technologies" written on the side. Toth was traveling eastbound on Pennsylvania Road in Romulus. At that time, Novak was outside snow blowing his driveway, which was located on the north side of Pennsylvania Road. As Toth approached Novak's house, he lost control of the vehicle, fishtailed a bit, crossed the center line, at least partially crossed the white fog line on the north side of the road, and struck Novak in the back. The impact caused Novak to bend backward

---

[1] Novak was the plaintiff in this case, but when he passed away several months after trial, Jessica Ayers, as personal representative of Novak's estate, was substituted as a party. See *Estate of Novak v Toth*, unpublished order of the Court of Appeals, entered October 2, 2024 (Docket No. 371716).

with his legs swinging up, sliding up the hood, and striking his head on the windshield.[2]  Novak's legs continued to swing upward, and his body went 8 to 10 feet into the air, performing two reverse somersaults, before landing face-first on the snow-covered ground.

Toth got out of the van and, along with a neighbor who came to assist, helped Novak to his feet.  During this time, Novak's fiancée and her friend came out of the house to lend aid as well.  Within 10 minutes, first responders arrived.  But despite being told to remain, as the sirens of those first responders could be heard, Toth rushed back to the van and left the scene without identifying himself.

Novak was briefly rendered unconscious from the collision and did not recall what happened.  Novak was diagnosed with a traumatic brain injury; fractures to the right rear side of ribs 8, 9, and 10; fractures on the front left side of ribs 6 and 7; and a Chance fracture to vertebrae T9 of the thoracic spine.[3]  Also damaged from the collision were Novak's liver, heart, and lungs.[4]

EMS transported Novak to the hospital, where Dr. Fred Junn, a neurosurgeon, performed surgery on Novak's thoracic spine on February 6, 2022.  Dr. Junn fused Novak's T8 through T11 vertebra together by using a combination of bone, metal plates, and screws.  Novak was discharged from the hospital on February 10, 2022.  Novak suffered from chronic pain afterward.  Trial testimony established it was likely that the pain would never go away and would only get worse, and the risk of re-injury would increase as Novak aged, affecting him every day for the rest of his life.

Novak experienced a radiating pain down his right leg after being discharged from the hospital.  In January 2024, Novak underwent a second spinal surgery, in which his L5-S1 vertebra were fused.  During this surgery, the surgeon, Dr. Michael Kapsokavathis, was concerned about the condition of the earlier fusion surgery and worked on that area as well.  Novak noted that after this procedure, the back pain was "tremendously" improved.

At the time Novak consulted with Dr. Kapsokavathis, another surgeon, Dr. Ronald Lederman, concluded that Novak required two other surgeries: a replacement of his right hip and a repair of a torn meniscus in his right knee.  Although Novak reported some issues with his hip in the years leading up to the accident, Dr. Lederman concluded that because Novak's condition

---

[2] The van incurred $10,000 in damages from the impact.  Most notable from the pictures taken afterward is the large dent on the driver's side of the front windshield that then caused spider-web cracking all around it.  Plaintiff's accident-reconstructionist expert, Timothy Abbo, testified that the damage to windshield illustrated a "classic head strike."

[3] A Chance fracture usually results from a very high-impact injury and is when the vertebrae is fractured across transversely.  See also <https://www.ncbi.nlm.nih.gov/books/NBK536926/> (accessed March 3, 2026) ("A Chance fracture is . . . a horizontal fracture extending from posterior to anterior through the spinous process, pedicles, and vertebral body.").

[4] Novak's heart was exhibiting atrial fibrillation (also known as AFib).  Novak's liver had a contusion but healed on its own.  And as a result of the collision, each of Novak's lungs were punctured, but the impacts were "tiny" and seemed to have healed on their own.

after the accident was much worse, the accident necessarily aggravated any preexisting condition in the hip.

Both Dr. Kapsokavathis and Dr. Lederman further testified that Novak likely would require even more surgeries in the future. Dr. Kapsokavathis opined that Novak likely would need at least two more spinal fusions, with the first occurring in about 10 years and another one five to 10 years after that. He explained that these other surgeries would be needed because when a fusion happens, areas around the fusion tend to wear out faster. Dr. Lederman testified that in addition to the hip replacement and knee surgeries he mentioned, Novak probably would need additional orthopedic surgeries, including a possible partial or full knee replacement.

Novak filed a complaint, alleging claims of negligence (direct negligence as to Toth and respondeat superior as to FSS) and negligent entrustment of a vehicle (as to FSS). Shortly before trial commenced, defendants filed a motion in limine to preclude the admission of evidence related to Toth's conduct after the accident. Defendants argued that because Toth's actions after the accident had no bearing on any of the elements of negligence, those actions were irrelevant, and evidence related to them was inadmissible. In response, plaintiff, relying on *Dodd v Secretary of State*, 390 Mich 606; 213 NW2d 109 (1973), argued that Toth's postaccident behavior was relevant because his failure to stay at the scene created an inference that Toth knew he was not exercising due care at the time, which was directly related to the claims of negligence. The trial court denied defendants' motion in limine, stating:

> It does go to the reliability of all of [Toth's] testimony that he left and possibly use for impeachment, but I think it does go to his character. And why did it, I mean there was some motivation to leave, what was it? I don't know if anybody asked him that in his deposition, but it's, it's relevant.
>
> These are the facts of the case. I don't like the characterization of fleeing, the man did stop, but thereafter there was zero follow through, which changed the makeup of the investigation for the police officers.
>
> So I'm denying the motion.

During trial, Toth's conduct was a focus of Novak's case. During opening statements, plaintiff's counsel suggested that Toth "knew he had many things [to] hide" and said Toth's behavior of leaving before the police arrived "is called a hit and run." Plaintiff's counsel questioned witnesses regarding Toth's conduct after the accident. Luis Sandavol was a Romulus Police Officer at the time of the accident and was dispatched to the scene. Sandavol said that under MCL 257.619, Toth broke the law by leaving the scene and failing to leave his name, address, and vehicle information. Sandavol further characterized Toth's behavior as a "hit and run" and "fleeing and [e]luding" and concluded that Toth's behavior showed that he was negligent and that he was hiding something. Timothy Abbo was plaintiff's expert accident reconstructionist. In addition to opining on how and where the accident occurred (Toth lost control of the van, crossed the center line, and struck plaintiff in the back while plaintiff was in the area of his driveway, not

-3-

in the roadway in any manner),[5] Abbo stated that Toth committed a felony by failing to remain at the scene and failing to provide his contact information to anyone. Abbo further concluded that Toth was negligent.

During the first week of trial, Toth was absent one day.[6] The proffered explanation was that he had suffered from food poisoning. Toth then failed to appear at all the second week of trial. On Monday, February 12, 2024, plaintiff's counsel was going to call Toth as a witness, but Toth was absent. Toth was not responding to any phone calls, so someone from the FSS went to Toth's home to check on him, but Toth refused access and shut the door in the person's face. An unidentified person in the courtroom that day suggested that Toth was a "very nervous person" and that he was absent because of "the stress of the whole situation." Defense counsel mentioned that he was concerned for Toth's well-being and requested a brief adjournment after plaintiff's next witness to ensure Toth's safety. Although defense counsel did not request a mistrial at this time, he did allude to possibly needing to request one depending on what they determined was happening with Toth. Plaintiff's counsel requested that a default be entered against Toth. The trial court declined to make a ruling at that time. At the close of trial on February 12, it was reported that someone from the defense went to Toth's home, and he would not answer the door. The trial court stated that it would enter an order requiring Toth to be present by Tuesday, February 13, 2024, at 2:00 p.m.

Toth did not appear in court. Defense counsel stated he believed Toth was receiving medical care at Henry Ford Hospital. Toth purportedly was admitted to the hospital for "alcohol-related issues." Defense counsel again asked for a one-day adjournment, which the court denied. Plaintiff's counsel renewed his motion for a default and alternatively asked for some of Toth's defenses to be stricken. The court declined to rule on plaintiff's request and allowed plaintiff to proceed with the case. After the testifying witnesses concluded that afternoon, defense counsel indicated that the hospital was going to hold Toth for "at least four days," making it certain that Toth would not be appearing for the remainder of trial. The trial court then strongly suggested that defense counsel consult with the insurer and try to settle the case. The court added that if the insurer was not going do anything, then it would impose sanctions under MCR 2.506(F)(3) and (4).

The next morning, defense counsel reiterated his request for a continuance until Toth was able to appear at trial and testify. Defense counsel stressed that FSS, a defendant in this case, did not violate any order and, through no fault of its own, was going to be prejudiced if Toth did not appear. Defense counsel stated Toth would have to remain at the hospital for 72 hours. Alternatively, counsel requested a mistrial. The court denied the request for a mistrial. Regarding

---

[5] In a statement Toth gave his employer after the accident, he averred that Novak was in the road at the time of the accident. Thus, plaintiff's counsel was presenting evidence that Novak indeed was not in the road when he was struck by the van.

[6] Plaintiff asserts on appeal that Toth was absent from trial on Friday, February 9, 2024, during the first week. However, that does not appear to be the case. On Thursday, February 8, 2024, plaintiff's counsel at the beginning of proceeding, acknowledged that Mr. Handy, FSS's president, was present every day and that Toth had been present "but obviously was sick yesterday." Thus, it seems that Toth was absent from the Wednesday, February 7, 2024 session of trial.

the request for an adjournment, the trial court inquired whether defense counsel could guarantee that Toth would appear on the following Friday or Monday to testify, and counsel could not do so. The court expressed that with there being no guarantees of Toth's attendance, it was not willing to grant an indefinite adjournment.

With Toth in violation of a subpoena and the trial court's latest order to appear, plaintiff's counsel again renewed his motion for a default judgment under MCR 2.506. The trial court denied the request for a default. However, the court indicated that it was going to grant some relief to plaintiff in regard to his claim against Toth.[7] Defense counsel then offered that FSS would admit negligence on the negligent-entrustment claim, on the condition that the jury did not learn about why Toth was not present: being in the hospital for alcohol-related issues. Counsel clarified that he was stipulating that both Toth and FSS were negligent, which rendered the court's ruling related to Toth moot. Plaintiff accepted the stipulation, making the issue of the amount of damages the sole question before the jury.

The next morning, plaintiff moved for a directed verdict on whether plaintiff had suffered a serious impairment of body function, and defendants did not oppose the motion. Defendants then moved for a directed verdict on the wage-loss claim, which the trial court denied. During closing arguments, plaintiff's counsel requested $45 million dollars for past noneconomic damages and $42 million dollars for future noneconomic damages. Defense counsel, on the other hand, suggested during closing argument that $750,000 for past noneconomic damages and $250,000 for future noneconomic damages was reasonable.

The jury returned a verdict in favor of plaintiff in the amount of $75,000 for future economic damages, $5,000,000 for past noneconomic damages, and $15,000,000 for future noneconomic damages. Without waiving any appellate rights, the parties subsequently stipulated to the amount of taxable costs plaintiff was entitled to, and a final judgment was entered for a total amount of $20,595,570.66.

On May 1, 2024, defendants moved for judgment notwithstanding the verdict (JNOV), for a new trial, and/or remittitur. Defendants argued: (1) a new trial was warranted because the trial court erroneously allowed evidence of Toth's postaccident conduct; (2) a new trial was warranted because the trial court erroneously denied defendants' motion for an adjournment or mistrial; (3) defendants were entitled to a new trial because of plaintiff's counsel's allegedly inflammatory remarks during closing argument; and (4) defendants were entitled to remittitur because the verdict was unsupported by the evidence. The trial court denied all aspects of defendants' motion and defendants now appeal.

## II. THE TRIAL COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION IN LIMINE

Defendants argue that the trial court erred when it denied their motion in limine to preclude the admission of evidence that Toth left the scene of the accident before the police arrived. We

---

[7] Although the trial court did not specify what this relief would be, it appears that it was to strike any defense that Toth was not negligent.

disagree. This Court reviews both a trial court's decision on a motion in limine and its decision to admit evidence for an abuse of discretion. *Bellevue Ventures, Inc v Morang-Kelly Investment, Inc*, 302 Mich App 59, 63; 836 NW2d 898 (2013); *Detroit v Detroit Plaza Ltd Partnership*, 273 Mich App 260, 275; 730 NW2d 523 (2006). "A court abuses its discretion when it selects an outcome falling outside the range of reasonable and principled outcomes." *Wolfenbarger v Wright*, 336 Mich App 1, 14; 969 NW2d 518 (2021).

Defendants assert that Toth's postaccident conduct was not relevant to any of the issues that would have been before the jury. Under MRE 402, only relevant evidence is admissible. MRE 401 defines "relevant evidence" as "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.) It is well established that evidence of "flight" is relevant and admissible to show consciousness of guilt:

> One who flees from the scene of an accident violates the statutory obligations to stop, give information and aid, and to make a report . . . . It is reasonable, therefore, to draw inferences from the flight of a driver involved in an automobile accident that might not be appropriate in another case. [*Johnson v Austin*, 406 Mich 420, 438; 280 NW2d 9 (1979).]

Defendants argue that any postaccident conduct is not relevant to prove the elements of negligence. But the evidence that Toth left the scene as sirens were approaching shows that he knew he did something wrong to cause his vehicle to strike Novak and evidences a guilty conscience.

The trial court admitted the evidence of Toth's conduct after the accident on the basis that his conduct reflected his character. While true, as defendants properly recognize, MRE 404(a) prohibits evidence of a person's character simply to show that a person acted in conformity with that character. But the trial court also suggested that the evidence was admissible because it shows there was an unknown motivation to leave. Although left unstated by the court, the evidence would allow a jury to infer that Toth's motivation was to remain unidentified because he knew he did something wrong, which is relevant evidence of negligence under MRE 401 and 402.

In sum, evidence of Toth leaving the scene before police arrived—without providing his contact information—is relevant because it tends to show that he knew he did something wrong, i.e., he knew he breached his duty to control his vehicle as a reasonably prudent driver would have, and did not want to be identified to avoid the consequences of his actions. It therefore is pertinent to a claim of negligence because it addresses the element of breach of duty.[8] To the extent the trial court relied on an incorrect reason for admitting the evidence, we nevertheless affirm because the trial court reached the correct result by admitting it. See *Wickings v Arctic Enterprises, Inc*, 244

---

[8] "To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages." *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

Mich App 125, 150; 624 NW2d 197 (2000) ("This Court ordinarily affirms a trial court's decision if it reached the right result, even for the wrong reasons.").

### III. THE TRIAL COURT DID NOT ERR IN DENYING DEFENDANTS' MOTION FOR ADJOURNMENT OR MISTRIAL

Defendants argue that the trial court erred by denying their requests for an adjournment and mistrial. We disagree. We review a trial court's decision on a motion for an adjournment or continuance, and a motion for a mistrial, for an abuse of discretion. *Ypsilanti Twp v Dahabra*, 338 Mich App 287, 292; 979 NW2d 725 (2021); *In re Flury Estate*, 249 Mich App 222, 228; 641 NW2d 863 (2002).

Although defendants sought adjournments and mistrials on three different days of trial, we only address the last request on Wednesday, February 14, 2024, because it is evident that any denial on those earlier dates had no adverse effect on defendants.[9] "A motion for adjournment must be based on good cause, and a court, in its discretion, may grant an adjournment to promote the cause of justice." *Soumis v Soumis*, 218 Mich App 27, 32; 553 NW2d 619 (quotation marks and citation omitted); see also MCR 2.503(B)(1), (D)(1).

Defendants argue on appeal that the continuance should have been granted because (1) illness generally constitutes good cause for adjournments, (2) adjournments are proper when "the witness had previously cooperated and no reason existed to expect his non-cooperation," and (3) plaintiff's counsel's improper and irrelevant arguments persuaded the trial court.

Regarding defendants' first argument, the trial court was not presented with any evidence that Toth was hospitalized or ill. All that was presented was defense counsel's representations, which were based on what someone else told him. Thus, the trial court was confronted with a party who was absent from trial for several days, with no evidence to show how or why the absences were justified. The court did not abuse its discretion by denying the motion because of claimed illness.

Defendants' second argument that an adjournment was warranted because Toth had cooperated in the past and there was no reason to expect he would not cooperate in the future is misplaced. Defendants cite *People v Jackson*, 467 Mich 272, 279; 650 NW2d 665 (2002), which held that the trial court erred by denying a request for a continuance when the witness was successfully served with a subpoena, the witness previously cooperated, and there was no reason to expect that the witness's cooperation would not continue. But contrary to *Jackson*, there were many reasons to question whether Toth would cooperate. After a few days into the first week of trial, Toth exhibited a complete unwillingness to cooperate. After Toth failed to appear at the start of the second week of trial, it was reported that he refused to allow anyone access to his home and did not answer the door, and that he would not respond to defense counsel's phone calls or

---

[9] Although the court did not grant the earlier requests, there is no appreciable harm to defendants because plaintiff merely proceeded with presenting his case-in-chief, with everyone's hope that Toth would appear at a later date.

-7-

messages. Therefore, *Jackson* is distinguishable, and the trial court did not abuse its discretion in this regard.

Defendants' third argument is also misplaced. Whether plaintiff's counsel made "proper" arguments is not the pertinent issue. The issue before us is whether the trial court abused its discretion by denying defendants' motion for an adjournment. Contrary to defendants' position, the trial court did not "accept" plaintiff's contention that Toth was intoxicated at the time of the crash. The court clearly stated that it did not know "whether he was drinking" or "what his problem was that day." The court's denial of the motion does not fall outside the range of reasonable and principled outcomes. From what the court was told, Toth, through his own behavior, made himself unavailable. And when directly asked if Toth would be available on the following Friday or Monday, defense counsel acknowledged that he could not provide such a guarantee. As a result, with no evidence demonstrating where Toth was or the reason for his absence and with no guarantee that Toth would be available after a brief adjournment, the court did not abuse its discretion when it denied defendants' motion.

Defendants also challenge the trial court's decision to deny their motion for a mistrial. In the trial court, defense counsel stressed that there were two separate defendants, Toth and FSS, and moved for a mistrial with regard to FSS because, with Toth not available, FSS's ability to present a defense was greatly impaired, through no fault of its own. However, defendants do not assert this same ground on appeal as a justification for a mistrial. Instead, defendants cite plaintiff's counsel's "diatribe" against defendants and the insurer in addition to plaintiff's counsel's strategy of focusing on irrelevant facts to inflame the jury as reasons the court should have granted the mistrial. By failing to assert that a mistrial was warranted on the same ground asserted in the trial court, the present argument is not preserved. We therefore deem the mistrial issue waived. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 293-294; 14 NW3d 472 (2023).

## IV. DEFENDANTS ARE NOT ENTITLED TO NEW TRIAL

Defendants argue that they are entitled to a new trial on account of plaintiff's counsel's inflaming of the jury's passions with irrelevant and improper statements. We disagree.

"This Court reviews the trial court's denial of a motion for new trial for an abuse of discretion." *Detroit/Wayne Co Stadium Auth v Drinkwater, Taylor, and Merril, Inc.*, 267 Mich App 625, 644; 705 NW2d 549 (2005). At the outset, we note that defendants never objected to any of plaintiff's counsel's statements during closing argument. But in this instance, that is not a bar to our review of the issue or a bar to defendants obtaining any relief. See *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 103; 330 NW2d 638 (1982) ("Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action.").

> In a civil case in which a party assigns as error on appeal remarks of counsel during closing arguments, but fails to object to those remarks at trial, the party must prove that (1) the remarks were so prejudicial as to have denied the party a fair trial and that (2) any resulting prejudice could not have been cured by a curative instruction. [*Badiee v Brighton Area Sch*, 265 Mich App 343, 373-374; 695 NW2d 521 (2005).]

This basis for appeal should be used "sparingly." *Id*. at 374, citing *Hunt v Deming*, 375 Mich 581, 585; 134 NW2d 662 (1965)

Defendants contend that plaintiff's counsel made many improper arguments and comments that denied them of a fair trial.[10] Defendants first argue that plaintiff's counsel made Toth's purported drinking a major theme of trial. Our review of the record reveals that is not true. While the possibility of Toth having been impaired at the time of the accident was mentioned, it was not conclusively stated that he was indeed drunk, and in any event, this topic was not a "major theme" of trial.

For instance, during opening statement, plaintiff's counsel stated that the responding officer, Sandoval, would testify that he would have wanted to view Toth's van immediately after the accident in order "to see what was going on in there," including wanting "to smell the inside of that vehicle to see if [he] got any smells [he] shouldn't be smelling, booze, drugs, whatever." This was an accurate preview of Sandoval's testimony. Sandoval said that among the first things he would have done had the van been present was to determine whether Toth was intoxicated, on medication, or other things "that need to be taken into account when it comes to an incident." Again, while this line of questioning mentioned the possibility that Toth may have been impaired, Sandoval admitted that it was quite possible that Toth had no alcohol and indicated that no witness who was near Toth at the scene ever mentioned that Toth smelled of alcohol.[11]

Although not cited by defendants, plaintiff's accident reconstructionist testified that alcohol and drugs are possible causes of the accident. He also mentioned there were "a number of reasons why a car could go out of control," including distracted driving. But that expert ultimately opined that "excessive speed," and driving "too fast for the existing conditions," was the likely cause of loss of control. Because these references do not say that Toth definitively was under the influence at the time of the accident, defendants cannot show how the comments unfairly prejudiced them.[12]

---

[10] Defendants' assertion that plaintiff's counsel's "vitriolic" attacks caused Toth to be hospitalized for alcohol-related reasons "after years of sobriety" is not supported by anything in the lower court record. There is no evidence that Toth became hospitalized because of anything plaintiff's counsel said, and there is no evidence that Toth had been sober for many years. And no note or record from a hospital or a doctor was submitted to the trial court explaining Toth's absences.

[11] Defendants' argument is also undermined by plaintiff's counsel's closing argument, where he admitted that he could not prove that Toth had been drinking.

[12] Defendants also take issue with the admission of Toth's driving record, which showed a conviction of driving under the influence from 17 years before the accident. Defendants stipulated to the admission of this exhibit. As a result, defendants have waived any error associated with the admission of the driving record, and waiver extinguishes any error. *Cadle Co v City of Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009) (stating that "waiver is the intentional relinquishment of a known right" and that "a party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error") (quotation marks and citations omitted).

Defendants next take issue with plaintiff's counsel's references to Toth leaving the scene of the accident before police arrived. As discussed in Part II of this opinion, contrary to defendants' view, Toth leaving the scene was relevant and proper only to show that Toth perhaps knew he had done something wrong, i.e., he had a guilty conscience. This evidence was pertinent to establishing liability only. After defendants conceded liability, the fact that Toth left the scene had no relevance for determining the amount of damages Novak suffered. Despite liability being resolved, and only damages being at issue, plaintiff's counsel argued in closing that:

> [W]hen the driver hit and ran and took off, hiding from the police, not my words, Officer Sandoval's words, fleeing from the police, hit and run, police, Officer Sandoval, Luis Sandoval, they knew what they did.

> No "I'm sorry." No "how is he?["] No "Can we visit? Can we send him flowers? Can we help? Can we do anything?" And you know what they did, they all, not just Toth, hid from that day till you all sat in those chairs. They eluded justice for that man right there is what they've been doing, and they got caught in this room because you all said, yes, I'll serve.

> \*     \*     \*

> . . . [W]hat really happened here? Something bad, y'all. You're not here to decide a crime, you all heard evidence. It was a crime. And it wasn't a small crime, it was a felony crime, and he got off.

> Normally, we don't get to talk about that. That came into evidence. He was charged. He, Toth, was charged for this crash. You all heard evidence. He then pled guilty to a lesser charge for this crash. That's negligence. Oh my God. It's actually worse than negligence, but let's move on.

> Fled. Hid.

> \*     \*     \*

> . . . But [Toth] didn't care. He was hiding, he was fleeing, he was out. And he got—almost got away with it until nine days ago today when you all came in. The only shot at justice that Terry Novak will ever have.

With defendants' liability already stipulated to, discussion of Toth's fleeing the scene had no bearing on anything the jury was to decide because the jury could only award compensatory damages for the amount of loss actually suffered; punitive sanctions may not be imposed. *Rafferty v Markovitz*, 461 Mich 265, 270-271; 602 NW2d 367 (1999). On one hand, as indicated during oral argument, it is unclear why plaintiff's counsel would choose to overemphasize Toth's post-accident behavior and its possible criminality when Toth's liability was stipulated to on February 14, 2024. On the other hand, the jury heard seven days of trial testimony including testimony regarding Toth's post-accident behavior and its potential criminality. Specifically, on the fourth day of trial, the jury heard Novak's neighbor Robert Russik, who was present at the scene of the accident. Russik testified that he told Toth to not leave the scene multiple times and that despite this directive, after sirens were heard, Toth went back to the van and sped away. The jury also

heard Sandavol testify that Toth broke the law by leaving the scene without leaving his name, address, and vehicle information. Sandavol characterized Toth's behavior as a "hit and run" and "fleeing and [e]luding." Anything plaintiff's counsel said at closing was submitted to the jury before the stipulation as to Toth's and the corporation's negligence was reached.

Defendants next argue that plaintiff's counsel inappropriately attacked defendants for exercising their constitutional right to defend themselves in litigation. During closing argument, plaintiff's counsel stated that when he was a kid, he played sports and coaches consistently preached it was proper to

> [t]ake responsibility. Some call it personal responsibility; take accountability for what you do, do the right thing, and when you make a mistake, if it's a mistake, or for some folks, if it—intentional, step up, accept responsibility, apologize, and mean it, and then show that you're sorry and be held accountable for everything. That's all that [Novak] has been trying to do under the law for two years.

*   *   *

> [Defendants are] the ones that are going to sit here and try to convince you, the same people that sat here in their opening statement, and I don't call lawyers out, and these are wonderful people, I respect them, but I hope they stand up and say, boy, did we screw up. We should have admitted [responsibility or liability] from day one, we're sorry.

> Because if I don't hear that, another slap on [Novak's] face.

Despite plaintiff's counsel's pleas in closing, there was no apology during defendants' closing argument. In rebuttal, plaintiff's counsel commented:

> Not a single apology. Not a single admission that [defendant's counsel] got up here and told you to your faces he was going to prove that there was no negligence. He did not stipulate the permanent, serious disfigurement or the—or the serious impairment of a body function until today.

> So what you're getting, you're getting the hiding and the fleeing and the hit and run all over again. And the only way it's going to stop is when you all go to the deliberation room, speak your mind, speak your votes. And when six out of eight of you agree, that will put an end to it finally.

Again, where the only issue before the jury was the amount of compensatory damages, plaintiff's counsel's commentary could be seen as irrelevant or distasteful. But asking for defense counsel to provide Novak with an apology, even when taken together with other irrelevant arguments in closing, was not "so prejudicial as to have denied [defendants] a fair trial" when defendants already stipulated to the fact that they were negligent. *Badiee*, 265 Mich App at 374.

Next, defendants point out that plaintiff's attorney also relied on subsequent remedial measures FSS enacted after the accident. Defendants cite plaintiff's counsel's opening statement, in which he referenced FSS's policies:

-11-

I think you're gonna find really interesting about no tolerance of alcohol and drugs. Never being on a cell phone while driving or any electronic thing. Having to report the accident to your employer, even though we have to under the law anyway. You're gonna hear all sorts of things that went on inside this corporation after [the] fact, all of which when you read it you'll see are grounds for termination, but yet he's still sitting right there. And you're gonna see and hear in this case that the real reason why he's sitting right there is because of this trial.

It is not clear how any changes FSS made to its policies after this accident were proper considerations for the jury. As a well-established principle of evidence, a party's subsequent remedial measures are "not admissible to prove negligence or culpable conduct in connection with the event." MRE 407; see also *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 189; 600 NW2d 129 (1999). In any event, it appears that defendants stipulated to the admission of evidence of these subsequent remedial measures. Exhibit 47, Toth's personnel file, was described as also containing FSS's policies. And defendants stipulated to the admission of that exhibit, thereby extinguishing any error associated with the admission of—and references to—that evidence. See *Cadle Co v City of Kentwood*, 285 Mich App 240, 255; 776 NW2d 145 (2009) ("A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error.").

Defendants lastly argue that plaintiff's lawyer employed the highly misleading tactic of "anchoring damages" to the entirely irrelevant earnings of highly paid professional athletes. As described by Justice MARKMAN, an "anchoring effect"

> occurs when people consider a particular value for an unknown quantity before estimating that quantity. [Professor Daniel Kahneman] asserts that the anchoring effect influences decisions even if the "particular value" considered has nothing to do with the quantity to be estimated. In the context of a jury trial, the anchoring effect suggests that the jury's final award may sometimes be unduly affected by a large initial presentation of damages. Accordingly, a jury may rely on a plaintiff's initial "anchoring value" to set the award's range and then reach a final award by "discounting." [*Hodge v State Farm Mut Auto Ins Co*, 499 Mich 211, 244; 884 NW2d 238 (2016) (MARKMAN, J., concurring) (citations omitted).]

During closing argument, plaintiff's counsel stated, "When you talk about money, we got to talk about, what do we have in the world that can give us some frame of reference in context to money and a lot of money?" Counsel then proceeded to recite the annual salaries from notable sports figures, including former Detroit Lions quarterback Matthew Stafford (salaries of $31 million and $41 million in different years) and Detroit Tigers player Miguel Cabrera (salary of $32 million).[13]

---

[13] Plaintiff's counsel made other extra-evidentiary references, including the $30 million Mary Barra as the CEO of General Motors makes in one year, the $200 million selling price of a Picasso painting, and references to "higher examples," including Bill Gates and Jeff Bezos.

Of course, assessing noneconomic damages is an imprecise endeavor. *Freed v Salas*, 286 Mich App 300, 334; 780 NW2d 844 (2009). Nevertheless, the determination must be based on the evidence. See *Shaw v City of Ecorse*, 283 Mich App 1, 17; 770 NW2d 31 (2009) (noting that a jury award must be supported by the evidence). Plaintiff's counsel suggested that the jury base its award of noneconomic damages, in part, on what professional athletes make in a year. The referenced salaries were not in evidence, making the argument improper. See *People v Finley*, 161 Mich App 1, 9; 410 NW2d 282 (1987) ("The purpose of closing argument is to allow attorneys to *comment on the evidence* and to argue their theories of the law to the jury.") (emphasis added), aff'd 431 Mich 506 (1988); *Head v Benjamin Rich Realty Co*, 55 Mich App 348, 359-360; 222 NW2d 237 (1974) (recognizing the appellate issue of counsel arguing facts not in evidence).

However, the jury was instructed to award compensatory damages solely on the basis of the evidence presented, and the jury was instructed that the attorneys' arguments are *not* evidence. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Zaremba Equipment, Inc v Harco Nat Ins Co*, 302 Mich App 7, 25; 837 NW2d 686 (2013) (citation omitted). Where the jury rendered a verdict at least $10 million dollars below the average $30 to $40 million dollar professional athlete salaries plaintiff's counsel cited, we do not see how plaintiff's closing argument altered the outcome of the case to warrant granting a new trial.

## V. DEFENDANTS ARE NOT ENTITLED TO REMITTITUR

Defendants relatedly argue they are entitled to remittitur because the damages award was excessive. We disagree.

"This Court reviews a trial court's decision to deny a motion for remittitur for an abuse of discretion." *Diamond v Witherspoon*, 265 Mich App 673, 692; 696 NW2d 770 (2005), app dis 716 NW2d 551 (2006). A court abuses its discretion when it selects an outcome falling outside the range of reasonable and principled outcomes. *Wolfenbarger*, 336 Mich App at 14.

"Remittitur is the procedural process by which a verdict of the jury is diminished by subtraction." *Pippen v Denison, Division of Abex Corp*, 66 Mich App 664, 674; 239 NW2d 704 (1976). "If the court finds that the only error in the trial is the inadequacy or excessiveness of the verdict, it may deny a motion for new trial on condition that within 14 days the nonmoving party consent in writing to the entry of judgment in an amount found by the court to be the lowest (if the verdict was inadequate) or highest (if the verdict was excessive) amount the evidence will support." MCR 2.611(E)(1).

In determining whether remittitur is appropriate, a court must view the evidence in a light most favorable to the nonmoving party and decide whether the jury award was supported by the evidence. *Taylor v Kent Radiology, PC*, 286 Mich App 490, 522; 780 NW2d 900 (2009). This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented. *Palenkas v Beaumont Hosp*, 432 Mich 527, 532; 443 NW2d 354 (1989). Such objective criteria include whether (1) the verdict was influenced by bias or prejudice, (2) whether it was within the limits of what reasonable minds would deem to be just compensation, and (3) whether the award was comparable to awards in similar cases. *Id*.

Under the first *Palenkas* criterion, as determined above, the jury verdict was not influenced by bias or prejudice because the parties stipulated defendants were negligent. The second *Palenkas* criterion addresses whether the $20 million verdict was within the limits of what reasonable minds would deem to be just compensation. We conclude it was. The record is replete with the medical issues Novak endured as a result of the accident. He suffered a traumatic brain injury and injuries to his heart, lungs, and liver. He broke several ribs and broke his spine, which required two spinal fusions. Testimony established he likely would need multiple more back surgeries in the future, in addition to future surgeries for his hip and knee. He had chronic pain syndrome, in which multiple medical providers testified that Novak would suffer pain every day for the rest of his life. With this evidence, it is not unreasonable to conclude that $5 million was justified for past noneconomic damages and $15 million was warranted for Novak's future noneconomic damages. While we cannot know exactly how the jury arrived at these numbers, $2.5 million per year for the past noneconomic damages is supported by the record. And the jury was instructed that a man of Novak's age had a life expectancy of 21.8 more years. If the jury presumed that Novak would only live another 15 years because of his compromised health, it could have awarded him $1 million per year. This amount is reasonable in light of Novak's testimony in which he described feeling less pain after his most recent back surgery.

For the third criterion, defendants cited other cases involving spinal injuries that awarded less damages for noneconomic injuries. It is important to recall that "no two cases precisely resemble one another" and "no two persons sustain the same injury or experience the same suffering." *Precopio v Detroit*, 415 Mich 457, 471; 330 NW2d 802 (1982). For those reasons, "[a]n appellate court should not attempt to reconcile widely varied past awards for analogous injuries which in the abbreviated appellate discussion of them seem somewhat similar." *Id*. (quotation makes and citation omitted). In any event, in the trial court, plaintiff cited some cases that his counsel tried that demonstrated that the jury's verdict in the instant case was not exceptional. In *Freed*, 286 Mich App at 333-337, this Court upheld a verdict of $14 million, which pertinently included $4 million for four hours of claimed, conscious pain and suffering, or $1 million per hour. In *Holt v Ushe*, unpublished per curiam opinion of the Court of Appeals, issued May 23, 2017 (Docket No. 330076), pp 2-5, this Court affirmed the jury's award of $6 million in past noneconomic damages and $15 million for future noneconomic damages. Although defendants have cited cases in which certain plaintiffs received lesser awards for "spinal injuries," defendants also provided cases that show that verdicts for noneconomic damages in the neighborhood of what the jury reached in this case exist. Thus, this factor does not weigh in favor of defendants. The objective evidence at trial supports the jury's verdict, and the trial court did not abuse its discretion in denying defendants' motion for remittitur.

Affirmed.

/s/ Adrienne N. Young